CLEWS et al. v. JAMIESON et al.

(Circuit Court, N. D. Illinois, N. D. July 5, 1898.)

PRINCIPAL AND AGENT—RIGHT OF PRINCIPAL AGAINST THIRD PERSON.

A principal who authorizes his broker to sell stock for him at a certain price cannot hold a purchaser to whom such broker has sold at a less price, since the principal is not bound by the sale.

In Equity.

Suit by the firm of Henry Clews & Co. against Malcolm M. Jamieson and others, co-partners as Jamieson & Co.

Towden, Estabrook & Davis, for complainants.

Tenney, McConnell & Coffeen, for defendants.

GROSSCUP, District Judge. The bill in this case is brought to charge a so-called trust fund in the hands of the Chicago Stock Exchange with the payment of a certain sum of money said to be due to the complainants from the defendants. The record presents many interesting questions, but the facts essential to the disposition of the case can be briefly stated as follows: The complainants, residents of the city of New York, in July, 1896, through their brokers, Schwartz, Dupee & Co., of the city of Chicago, sold upon the Chicago Stock Exchange, for the July account, 500 shares of the Diamond Match Company's stock, at 221⅛ per share, and subsequently 200 shares at 221½. Later in the month, at the instance of the complainants, these transactions were changed to the August account, at 229. The purchase and sale were, on both sides, probably, through brokers, whose respective principals remained undisclosed either to the broker or principal on the opposite side of the transactions. Under the rules and practice of the exchange, the method of doing business between the brokers is stated to be as follows:

"At ten o'clock there is an official call, at which the secretary and manager call all the stocks, bonds, and securities on the official printed list; and, as this call progresses, any member wishing to buy or sell bids thereon, and the record is made of the transaction, after which there is an irregular call, which closes at half past one, when the manager of the clearing house announces the clearing house or settlement prices for the day, which are the closing prices on the exchange for the respective stocks and securities. The manager then substitutes trades, and sends out cards to all buying or selling on the account for the current month or for the next month. That on the 25th of the month, and thereafter until the second day before the end of the month, two calls are made,—one for the current month, and one for the next ensuing month,—and this is done to allow those who wish to do so to change their accounts over to the next month. That this substitution was made by the clearing department by a system somewhat similar to that employed by the clearing house for banks; that is, that, where a broker has purchased and sold during the day the same amount of the same kind of stocks or bonds, his account is balanced by the clearing department, and all margins deposited by such broker may be withdrawn. That, when sales and purchases are made by different brokers,—one buying and the other selling the same kind of stocks or bonds,—a substitution is made by the manager of the clearing department, by which it appears that the broker selling has sold such stock, not to the person to whom it was originally sold, but to a person or persons other than those to whom such sales were originally made, and who originally

bought of some one else, and that a broker purchasing stock has purchased from some broker other than the broker from whom he originally purchased the same. For instance, if A. had sold 100 shares of stock to X., and B. has bought the same amount of the same stock from Y., and X.'s and Y.'s accounts are balanced by other transactions, the substitution would make it appear that A. sold to B., and the names of the parties with whom the original transactions had actually been made by A. and B. would not appear on the clearing-house sheet. That, in the transactions on said exchange, it is then customary for the parties thus substituted and brought into the relation of buyer and seller with each other by the manager to assent to the new regulations thus formed, and to confirm the transactions thus adjusted by the manager, and to put up the margins required by the rules, unless margins are already on deposit in the exchange, in which case they are transferred by the manager to the new account."

Pursuant to this method, the firm of Schwartz, Dupee & Co. on the 3d of August cleared its transactions with the other brokers, resulting in 1,550 shares of the Diamond Match stock, the sellers of which were represented by Schwartz, Dupee & Co., being so transferred that the defendants stood, by substitution as to Schwartz, Dupee & Co., the purchasers, at 222. It is clear that thereafter, as between Schwartz, Dupee & Co. and the defendants, there was such privity of contract that the defendants were under obligation to take of Schwartz, Dupee & Co., during the month, 1,150 shares of the stock in question at 222. On the same day (August 3d) the stock exchange was, by order of its officers, closed, and remained closed until the 5th of November following. On the last day of the month, Schwartz, Dupee & Co. tendered to the defendants certificates for the 1,150 shares of the Diamond Match Company stock, which certificates the defendants refused to accept. Subsequently, in September, after due notice, Schwartz, Dupee & Co. sold these shares at public auction to the highest bidder, realizing therefor the sum of $130 per share. This resulted in a loss to them or their principals of about $92 per share. Under the rules of the stock exchange, 10 per cent., par value, of the stock dealt in, had been deposited with the stock exchange as a fund in guaranty of the transactions. The object of the present suit is to recover the difference between the contract and the selling price of these shares, and to subject this guaranty fund, amounting to $7,000, to the payment, pro tanto, of such loss.

There can be no question that there came into existence, by the transactions stated, a contract, primarily between Schwartz, Dupee & Co. and the defendants, whereby the latter were obliged to purchase of the former, and the former were obliged to sell to the latter, during the month, 700 shares of this stock, at the price of 222 per share. Nor can there be any doubt that the undisclosed principals of either of these parties were entitled to step into the place of these respective brokers, and in their own name, and for their own benefit, insist upon the enforcement of the contract according to its terms. Clearly, under the rules of the exchange, each of the brokers bound himself, both to the other broker, and to the principal whom the other broker represented, to carry out the terms of the contract. The only question is whether the complainants were parties principal to the contract between Schwartz, Dupee & Co. and the defendants. The evidence discloses that

their authority to the brokers was to sell 700 shares of this stock at 229; and, while the authority to sell for more than this might be implied, authority to sell for less could certainly not be. They were entitled, under their contract with Schwartz, Dupee & Co., to a purchaser at 229, or more. They were bound to no sale at a figure less. Neither Schwartz, Dupee & Co., nor any persons with whom that firm had contracted, could have compelled the complainants to deliver the stock at a price less than 229. But the ·contract between Schwartz, Dupee & Co. and the defendants was for the sale of 700 shares at 222. Under the contract between the brokers, the defendants could have demanded a conveyance at 222. But of whom could they have made such demand? Certainly not from the complainants. Their contract was for 229, and no less. The devices of the exchange for clearing and counterbalancing accounts between brokers could not, without their consent, change so essential a term of the complainants' sale. It cannot be that authority from a principal to sell at 229 can, without his conscious assent, be transformed into authority to sell at 222. The original understanding that the sale should be made under the rules and practice of the stock exchange cannot be interpreted to give such elasticity to the all-important feature of price. Who would deal on the exchange, as principal, if it were understood that the prices named had no fixity,—that the obligation might be one thing to-day, and another totally different thing to-morrow? While the substitutions, resulting in prices unquestionably different from those originally authorized, bind the brokers participating, they do not, in the absence of assent, reach over so as to change the contract rights of the principals. To hold otherwise would be to abolish by judicial pronouncement the authority on the faith and stability of which every transaction on the exchange is grounded. But if the defendants, under the substitution, could not hold the complainants, as principals, to the contract for the sale at 222, then, for want of mutuality, the complainants are in no position to hold the defendants. There is, indeed, no identity of contract between the one the complainants authorized, and the one entered into between Schwartz, Dupee & Co. and the defendants. That the complainants now choose to accept it is of no significance. The legal fact remains that they are not so bound, and, not being so bound, the defendants, on their part, are not legally bound. Whatever legal obligation the defendants owe is, under the contract of substitution, to Schwartz, Dupee & Co. alone. Between the complainants and the defendants there is no privity, and therefore no enforceable obligation. For the foregoing reasons the bill must be dismissed.